FILED
07/01/2026
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 1, 2026

**IN RE MERCURY H.**

**Appeal from the Juvenile Court for Greene County**
**No. 25-J-30981     Kenneth N. Bailey, Jr., Judge**

_____

**No. E2025-01810-COA-R3-PT**

_____

Mother appeals the termination of her parental rights. The trial court found multiple grounds for termination and that termination of Mother's parental rights was in the child's best interest. In concluding that termination of Mother's parental rights is in the child's best interest, the trial court made specific findings for twelve of the twenty statutory best interest factors but declined to consider eight of the factors based upon a purported pleading deficiency. Mother appeals. We affirm in part, vacate in part, and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; Vacated in Part; Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KRISTI M. DAVIS, J., joined.

Cody T. Knight, Erwin, Tennessee, for the appellant, Kayla C.

Jonathan Skrmetti, Attorney General and Reporter; and Amber L. Barker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

Mercury H. was born in May 2020 to Kayla C. (Mother). The Tennessee Department of Children's Services (DCS) first became involved with the family in April 2023 following a referral regarding domestic violence. The child was removed from Mother's custody pursuant to an emergency protective order on July 17, 2023. At the time of the removal, Mother admitted to using methamphetamine. The then three-year-old child

had not received any medical care since she was six weeks old, and DCS investigators discovered a cluttered home in disrepair. The juvenile court adjudicated the child dependent and neglected.

To facilitate reunification, DCS developed multiple permanency plans, providing a roadmap for Mother to regain custody. The agency offered a wide array of resources to aid in this process, including homemaker services, housing assistance, and intensive outpatient drug treatment. Mother's responsibilities under the plans included completing alcohol and drug, mental health, and parenting assessments, submitting to random drug screens, maintaining safe and stable housing, securing a legal source of income, paying child support, and maintaining a reliable means of transportation.

Initially, there were promising signs of progress. Mother completed her assessments, engaged in intensive outpatient treatment at a living center, finished parenting classes, and began paying child support. While living at the center, Mother also successfully secured employment working at a local McDonald's. Her efforts marked sufficient progress to enable a supervised visit with Mercury in February 2024 followed by four extended, unsupervised visits with Mercury in the spring of 2024.

Mother's circumstances deteriorated, however, after she voluntarily left the supportive environment of the living center. She left the living center because she found the program's requirements and class schedules too difficult to maintain. Despite receiving assistance from DCS case manager Crystal Deeble to complete applications for the Greeneville Housing Authority, Mother did not submit paperwork to secure independent housing. Instead, she returned to live with her parents and stepfather, which she acknowledged was inappropriate for a child due to their active drug use and criminal histories. This was the same environment from which the child had originally been removed, and Mother soon began relying on her mother, who was still using drugs, for both transportation and employment.

In this environment, Mother suffered a relapse in July 2024, testing positive for methamphetamine and amphetamine. Following her relapse, Mother ceased engaging with DCS services, repeatedly declining its continuing offers for assistance. She missed or failed subsequent drug screens from October 2024 through June 2025, and she ultimately lost her visitation privileges. Because she could not pass the two consecutive drug screens required by DCS to reinstate contact, Mother did not see Mercury again after July 2024.

On July 15, 2025, DCS filed a petition to terminate Mother's parental rights.[1] In the immediate aftermath of the petition's filing, Mother attempted to correct course by re-

---

[1] DCS also filed to terminate Michal H.'s (Father) parental rights. Father declined to personally participate in the proceedings. Following the trial, the court terminated Father's parental rights. Father elected not to appeal; accordingly, only Mother's parental rights are before this Court on appeal.

enrolling in an outpatient program in late July 2025. Although she admitted to using methamphetamine on the very day she re-entered treatment, Mother thereafter began passing drug screens for methamphetamine. Nevertheless, she continued to consistently test positive for THC. She paid her child support arrears following a finding of civil contempt and claimed she had recently submitted an application for independent housing, though she remained living in her parents' home at the time of trial.

The juvenile court conducted a trial on October 14, 2025. Mother testified to her enduring bond with the child, her recent strides in treatment, and her desire for reunification. DCS presented evidence that Mercury, who was five years old at the time of trial, was thriving in her current foster home. While the placement was not pre-adoptive, DCS had already identified a potential adoptive family and begun arranging respite visits to smoothly transition Mercury into a permanent home; however, a formal adoption could not progress without Mother's parental rights being terminated. Ultimately, the trial court found by clear and convincing evidence that Mother's parental rights should be terminated on the grounds of abandonment by failure to visit and failure to provide a suitable home, substantial noncompliance with the permanency plans, persistence of conditions, and failure to manifest an ability and willingness to assume custody. The trial court also concluded that termination of Mother's parental rights was in Mercury's best interest.

Mother appeals. She does not contest the statutory grounds for termination found against her. She does, however, contend that the trial court erred by concluding that termination of her parental rights is in Mercury's best interest.

II.

Parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d). "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing

evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596; Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

III.

On appeal, Mother does not challenge the trial court's determination that statutory grounds exist to terminate her parental rights. However, the Tennessee Supreme Court has instructed appellate courts to review the trial court's findings as to each ground for termination found by the trial court and the determination that termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal. *In re Carrington H.*, 483 S.W.3d at 525-26. Accordingly, we address each ground for termination found by the trial court in turn below.

A. Abandonment by Failure to Visit

The trial court found by clear and convincing evidence that Mother abandoned the child by failing to visit her in the four months immediately preceding the filing of the termination petition. Tennessee Code Annotated section 36-1-113(g)(1) (effective July 1, 2025 to July 1, 2026)[2] provides that a parent's rights may be terminated for abandonment, as defined in Tennessee Code Annotated section 36-1-102. Under the statute, when a child is over the age of four at the time the petition for termination was filed, abandonment occurs where

> for a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child.

---

[2] *See In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.")

- 4 -

Tenn. Code Ann. § 36-1-102(1)(A)(i)(*a*) (effective May 9, 2025). Failure to visit is defined as "the failure, for the applicable time period, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E).

The relevant four-month statutory period in the present case spans from mid-March 2025 through mid-July 2025. *See In re Malik G.*, No. E2019-01040-COA-R3-PT, 2019 WL 6245483, at *14 (Tenn. Ct. App. Nov. 21, 2019) (this four-month period "includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed" (quoting *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014))). The trial court found, and the record confirms, that Mother did not visit the child at any point during this four-month window. In fact, Mother's last visit with the child occurred in July 2024, over one year before the petition was filed. DCS suspended Mother's visitation privileges in September 2024 following a failed drug screen but gave her the opportunity to reinstate contact if she could provide two consecutive clean drug screens. Mother failed to complete this requirement by outright refusing to submit to the requested screens, failing to show up for visits, and testing positive for methamphetamine and THC. Mother remained unable to satisfy DCS's requirement of two consecutive clean drug screens necessary to resume visitation.

The trial court concluded that Mother failed to visit Mercury during the statutory time period. The record confirms the trial court's finding that Mother did not visit Mercury during the relevant lookback period. The trial court did not err by concluding that the ground of abandonment by failure to visit was proven by clear and convincing evidence.

### B. Abandonment by Failure to Provide a Suitable Home

The trial court also found by clear and convincing evidence that Mother abandoned the child by failing to provide a suitable home. Pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(ii), abandonment also occurs when:

> (*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
>
> (*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

- 5 -

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department . . . .

A suitable home requires more than just an adequate physical space; it entails "'[a]ppropriate care and attention' for the child and 'must be free from drugs.'" *In re Zaniyah C.*, No. E2025-00568-COA-R3-PT, 2025 WL 3458901, at \*3 (Tenn. Ct. App. Dec. 2, 2025), *perm. app. denied* (Tenn. Feb. 24, 2026) (quoting *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at \*7 (Tenn. Ct. App. Apr. 20, 2016)).

Following the child's removal in July 2023 due to environmental neglect, domestic violence, and Mother's drug use, DCS provided services to help Mother secure a suitable home. These efforts included offering homemaker services, housing assistance, and intensive outpatient drug treatment through a living center. Despite DCS's efforts to help her establish independent housing, Mother failed to make reciprocal efforts.

The trial court concluded that "[t]he home where [Mother] resides is not appropriate given the addiction issues with the other residents in the home and also the criminal history of the folks living in that home." The record supports this determination. Mother testified at trial that her parents and stepfather were in active addiction, and she had previously acknowledged to DCS that the residence was inappropriate for the child.

Regarding independent housing, the trial court found that DCS "provided her assistance with obtaining alternative housing." Despite DCS's earlier efforts, Mother testified at trial that she had only recently applied to the housing authority and intended to submit other housing inquiries after the hearing. With her delay in addressing this matter, more than two years after removal, Mother remained living in an environment where there was active drug use, and she continued to struggle with her own addiction, having suffered a relapse and testing positive for THC, methamphetamine, and amphetamine while living in this environment. *See In re Jaxson F.*, No. E2023-00326-COA-R3-PT, 2023 WL 7179319, at \*5-6 (Tenn. Ct. App. Nov. 1, 2023) (affirming this ground due to a mother's inability to overcome substance abuse problems and lack of housing).

Based upon our review of the record, we conclude that the ground of abandonment by failure to provide a suitable home was proven by clear and convincing evidence.

## C. Substantial Noncompliance with Permanency Plans

The trial court also found by clear and convincing evidence that Mother was in substantial noncompliance with the requirements of her permanency plans. This ground for termination exists where clear and convincing evidence shows that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2).

To terminate parental rights under this ground, the trial court must first find that the requirements of the permanency plan are "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Carrington H.*, 483 S.W.3d at 537 (quoting *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). The court must then determine whether the parent's noncompliance is substantial "in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Whether noncompliance is substantial is a question of law reviewed de novo with no presumption of correctness. *In re Ethan W.*, No. M2021-01116-COA-R3-PT, 2023 WL 415999, at *6 (Tenn. Ct. App. Jan. 26, 2023) (citing *In re Valentine*, 79 S.W.3d at 548).

While Mercury was in foster care, DCS developed five ratified permanency plans for Mother. Her responsibilities under these plans consistently included completing alcohol and drug, mental health, and parenting assessments, submitting to random drug screens, maintaining safe and stable housing, securing a legal source of income, paying child support, and maintaining reliable transportation. In its final order, the trial court found that these plans "were reasonable and addressed the issues that caused this child to come into custody," noting the initial conditions of substance abuse, lack of safe housing, and the child's lack of medical care.

The trial court acknowledged the positive steps Mother took to satisfy her obligations. As the court observed, Mother "sought treatment through Strong Futures and is currently enrolled in intensive outpatient alcohol and drug treatment . . . which is very good." She also completed parenting education and paid her court-ordered child support.

Nevertheless, when viewed in light of the importance of the requirements that remained unmet, Mother's efforts fell substantially short. Chief among the reasons for the child's removal were Mother's drug use and the unsafe condition of her home. As the trial court found, Mother ultimately "failed to stay drug free." She suffered a significant and extended relapse, had her visitation suspended in September 2024 due to failed drug screens, and subsequently "failed to submit the drug screens in March, April, and May of 2025." Furthermore, Mother failed to establish an independent, safe residence or a

- 7 -

verifiable legal source of income. The court noted that while she had an income working for her own mother, "there has been no proof provided about where that is coming from," and she continued living with her parents in an environment beset by active addiction, which the trial court concluded was "not a safe and stable home."

From our review of the record, it is clear that Mother failed to comply with reasonable requirements that were of substantial importance in her permanency plans — maintaining sobriety and establishing a safe, independent home. We conclude the ground of substantial noncompliance with the permanency plans was proven by clear and convincing evidence.

### D. Persistence of Conditions

The trial court also found by clear and convincing evidence that the conditions leading to the child's removal persisted. Parental rights may be terminated for the persistence of conditions when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:
>
>> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>>
>> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>>
>> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard . . . .

Tenn. Code Ann. § 36-1-113(g)(3).

Here, the trial court found that

This child was placed in DCS custody due to substance abuse concerns by both parents, domestic violence in the home, and lack of safe and stable housing. The home was very cluttered and not safe for a small child. The child had also not seen a pediatrician in two and half years at the time of removal. The Court finds that the lack of safe and stable housing is still a problem in this case. The mother is trying really hard to get her own housing and said that she intends to go today to submit an application to Greeneville Housing Authority. The Court is aware that there is typically a waitlist at Greeneville Housing Authority and so unfortunately, she would not likely be able to secure housing there anytime soon. This child has been in DCS custody for over two years and so we are not making much progress as to the housing and this is concerning to the Court. With respect to substance abuse issues, the mother did have a significant relapse. The Court is very proud of her for entering the Strong Futures program again. It is a great program and the Court is very happy that she returned to Strong Futures in July 2025. Hopefully, moving forward, [Mother] will be able to maintain her sobriety. She is passing drug screens with the exception of THC. The Court is proud of her for cessation of the methamphetamine use, but it is still concerning that she continues to use THC. THC is still an illegal drug in Tennessee and the Court has concerns that she is testing positive for that drug. The Court finds that DCS has met its burden of proof as to the ground persistent conditions by clear and convincing evidence.

The purpose behind the termination ground of persistent conditions "is to prevent a child from languishing in foster care if it appears that the parent cannot demonstrate an ability to provide a safe and caring environment within a reasonable amount of time." *In re B.D.M.*, No. E2022-00557-COA-R3-PT, 2023 WL 3019005, at *11 (Tenn. Ct. App. Apr. 20, 2023) (citing *In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016)). The failure to remedy the conditions which led to the removal need not be willful. *Id.*; *see also In re Daymien T.*, 506 S.W.3d 461, 473 (Tenn. Ct. App. 2016) ("A parent's continued inability to provide fundamental care to a child, even if not willful, constitutes a condition which prevents the safe return of the child to the parent's care." (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008))). Accordingly, "this termination ground is not dependent on a parent's efforts to improve the circumstances that led to a child's removal. Rather, the focus lies on the results of those efforts." *In re Jeremiah B.*, No. E2022-00833-COA-R3-PT, 2023 WL 2198864, at *8 (Tenn. Ct. App. Feb. 24, 2023) (citing *In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005)).

The record reflects that the child was removed from Mother's custody in July 2023 and subsequently adjudicated dependent and neglected, satisfying the six-month requirement prior to the October 2025 trial. The initial removal was prompted by a

domestic violence incident, Mother's drug abuse, and a cluttered, unsafe home environment where the young child had lacked medical care since she was six weeks old.

At the time of trial, over two years later, the conditions preventing the child's safe return remained largely unresolved. The trial court found, "the lack of safe and stable housing is still a problem in this case." Mother continued to reside in the same home from which the child was removed, an environment she candidly admitted was inappropriate due to the active drug addiction and criminal histories of her parents. Furthermore, regarding substance abuse, the trial court noted that Mother "did have a significant relapse" and expressed concern that "she continues to use THC."

Although the trial court commended Mother for recently re-entering the Strong Futures treatment program, it rightfully observed that "this child has been in DCS custody for over two years and so we are not making much progress as to the housing and this is concerning to the Court." Despite receiving assistance and referrals for housing from DCS, Mother had not submitted applications for independent housing prior to trial. Given the amount of time that had passed without significant, lasting improvement, there was little likelihood these conditions would be remedied at an early date. *See In re Jaylynn J.*, No. M2023-01496-COA-R3-PT, 2024 WL 2933349, at *10 (Tenn. Ct. App. June 11, 2024) (finding that after two years without demonstrating lasting sobriety or stable housing, it is unlikely the conditions will be remedied at an early date). Finally, the continuation of the parent-child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home. Mercury is doing extremely well in her foster placement, and DCS is actively arranging visits to identify an adoptive family who can provide the permanency she deserves.

From our review of the record, we conclude the ground of persistence of conditions was proven by clear and convincing evidence.

### E. Failure to Manifest an Ability and Willingness to Assume Custody

Finally, the trial court found by clear and convincing evidence that Mother failed to manifest an ability and willingness to assume legal and physical custody of the child. Tennessee Code Annotated section 36-1-113(g)(14). This ground requires the petitioner to prove by clear and convincing evidence that the parent has

> failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). The Tennessee Supreme Court has clarified that

[t]wo prongs must be proven by clear and convincing evidence to terminate parental rights under this statute: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

The Tennessee Supreme Court has indicated that the statute "places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Failure of the parent to manifest either ability or willingness will satisfy the first prong. *Id.* at 677. "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome . . . obstacles" preventing the parent from assuming custody. *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). A parent's express desire to reunite with the child is insufficient to establish a willingness to assume custody. *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019). To the contrary, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). This court considers a parent's efforts to overcome any obstacles standing in the way of assuming custody or financial responsibility. *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (citing *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). A failure to make efforts to overcome such obstacles "can undercut a claim of willingness." *Id.* As for the second prong, a substantial risk of harm requires "a real hazard or danger that is not minor, trivial, or insignificant" and requires the harm to be more than a "theoretical possibility"; instead, the harm must be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018).

The trial court found that Mother "has not been fully engaged with the department for the entire time the child has been in DCS custody," noting periods where she made no progress on her permanency plan requirements. While Mother had recently re-entered outpatient treatment in July 2025, she had not visited the child in over a year because she failed to provide the clean drug screens required to reinstate her visitation privileges. Furthermore, Mother suffered a relapse on methamphetamine in July 2024 and consistently tested positive for THC throughout the custodial episode, including the month prior to trial. She also continued to lack independent housing, having failed to submit applications to the housing authority prior to the eve of trial, and instead remained reliant on her mother, who was an active drug user, for both "under the table" employment and for transportation.

Consequently, Mother failed to demonstrate the ability or the willingness to assume custody of the child.

The second prong of the statute requires a showing that placing the child in the parent's custody would pose a risk of substantial harm to the physical or psychological welfare of the child. This risk must constitute "a real hazard or danger that is not minor, trivial, or insignificant." *Ray*, 83 S.W.3d at 732. The trial court found that returning the child to this environment "would pose a risk of physical and psychological harm to the child due to drug use in the home and criminal activity of relatives" residing there. The record supports this determination. Mother readily admitted to DCS and the trial court that her residence was inappropriate for the child due to the active drug addiction and criminal histories of her parents and stepfather, with whom she lived. Exposing the child to a home environment with active drug use poses a real hazard and a risk of substantial harm to the child's welfare. *See In re Daylan D.*, No. M2020-01647-COA-R3-PT, 2021 WL 5183087, at *10 (Tenn. Ct. App. Nov. 9, 2021) ("It is generally without dispute that a home where drugs are being abused is not safe for a child.").

From our review of the record, we conclude the ground of failure to manifest an ability and willingness to assume custody was proven by clear and convincing evidence.

IV.

Having determined that at least one statutory ground for termination has been shown against Mother by clear and convincing evidence, our focus now shifts to what outcome is in Mercury's best interest. *See In re Audrey S.*, 182 S.W.3d at 877-78. The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or

- 12 -

against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

The nonexclusive factors relevant to the best interest analysis are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i).

After reviewing this list of factors, the trial court concluded that terminating Mother's parental rights was in Mercury's best interest. Addressing these factors, the trial court made the following findings:

Factors A and B were not pled by DCS and therefore do not weigh in favor of or against termination in this matter.

C. The Court finds with respect to . . . the mother, unfortunately she does not have safe and stable housing. At this time she has re-engaged with Strong Futures, and hopefully they can assist her in finding housing where she can maintain her sobriety. The Court is concerned that she continues to live in her current residence, she will relapse again. The Court finds that because of the housing issues for the mother, this factor weighs in favor of termination.

D. The Court finds the . . . mother has not been able to visit in over a year because she relapsed and did not complete drug screens or failed the drug screens. Therefore, this factor weighs in favor of termination.

E. The Court finds the . . . mother did have unsupervised visits at one point in this case, but she has not seen the child in a year. This factor would weigh in favor of termination.

Factors F, N, G, and H were not pled and do not weigh in favor of or against termination.

I. The Court finds that this child has developed relationships with persons in her foster home and in school which have positively impacted the child. The Court is certain she is developing relationships with teachers and other students, but she has not had a relationship with either parent. She has not had a relationship with the mother in the past year . . . . Therefore, this factor would weigh in favor of termination.

J. The Court finds that due to the fact that there continues to be drug use in the mother's home and criminal history of folks that live in the home this factor applies. The mother did relapse on methamphetamine and tested positive in July 2025. She is back in a program now and the Court is excited

for her being in that program, but it is still concerning that she relapsed recently. . . . The Court finds that this factor weighs in favor of termination.

K. The Court finds that DCS has offered services to both parents. In this case the mother did take advantage of the Strong Futures program and was living in the living center at the program for a while. The mother did complete an alcohol and drug assessment. She did take some steps to utilize and take advantage of the programs offered by DCS, but she still does not have safe and stable housing. DCS would have assisted her with housing if she had remained engaged. She obtained and completed applications, but she did not turn them in to the Housing Authority. The Court finds as to both parents that they have failed to take advantage of all of the programs and services available to help them make a lasting adjustment and that is the key in this case — making a lasting adjustment. The mother relapsed . . . for a period of about a year and was not seeking treatment and was not engaged with DCS. Thankfully in July 2025, she did get back into treatment. That is a positive for the mother, but there was the period during this case that she was not engaged, therefore this factor weighs in favor of termination.

L. The Court must determine whether or not DCS made reasonable efforts to assist the parents in making a lasting adjustment to their lifestyle or condition. DCS held several child and family team meetings, and they developed six permanency plans in this case. DCS provided services for each of the parents and Omni was the contract agency that worked with the foster family on behalf of the child. Omni would have worked with the mother also. The Court finds that DCS did provide services to each of the parents. . . . The mother was engaged to an extent, but she did not make the lasting adjustment that was needed to be able to have the child returned to her. Therefore this factor weighs in favor of termination.

Factors M, N, and O were not pled and do not weigh in favor of or against termination.

P. The Court finds that the . . . mother, unfortunately, has not seen the child since July 2024. It has been over a year and so this factor weighs in favor of termination.

Q. The Court finds that the parents lack the ability and commitment to create and maintain a home that would meet the needs for the child so the child could thrive. . . . The mother has struggled. The Courts noted that during her testimony she testified that there are people who reside with her in her current residence, namely her parents, who are in active addiction. Therefore, DCS has met its burden of proof as to this factor and it would be in the best interest

- 16 -

of the child for termination to occur.  The Court finds it weighs in favor of termination of the parents' parental rights.

R. The Court finds that the physical environment of the mother's home would not be safe for the child . . . so this factor weighs in favor of termination.

S. The Court finds that the mother has tried to pay child support, even though it was a minimal amount it was the amount ordered and DCS has not met its burden of proof as to the mother for this factor and this factor would weigh against termination of the mother's parental rights. . . .

T. The Court finds that the mental or emotional fitness of the parents could prevent them from being able to provide safe and stable care for the child . . . .  The mother was at Strong Futures receiving counseling and individual therapy.  There was a period for about 11 months that she was not engaged with Strong Futures and was not addressing her mental health needs.  She has re-engaged in July 2025 with Strong Futures, but the Court looks at the time prior to the filing of the Petition and she was not addressing her mental health needs.  The mother needs to be in regular counseling and regular therapy.  The Court is pleased that she is back at Strong Futures receiving those services; however, prior to the filing of the Petition, she was not addressing her mental health needs.  Therefore, this factor weighs in favor of termination.

Ultimately, the trial court concluded 11 of the 20 factors weighed in favor of termination, and that it was in the best interest of Mercury that Mother's parental rights be terminated.

In considering termination of parental rights, the determination of a child's best interest "may not be reduced to a simple tallying of the factors for and against termination." *In re Chayson D.*, 720 S.W.3d 123, 146 (Tenn. Ct. App. 2023).  Rather, a court must determine, after completing a holistic assessment of the record, whether terminating a particular parent's rights would be in a particular child's best interest. *See id.*

Tennessee's "parental termination statutes require the trial court to 'enter an order that makes specific findings of fact and conclusions of law.'" *In re Giavanna K.*, No. E2025-00508-COA-R3-PT, 2026 WL 117095, at *5 (Tenn. Ct. App. Jan. 15, 2026) (quoting Tenn. Code Ann. § 36-1-113(k)).  The Tennessee Supreme Court "has stated that, without appropriate findings of fact, 'an appellate court cannot conduct a de novo review and the case must be remanded for the trial court to enter sufficient findings of fact and conclusions of law.'" *Id.* (quoting *In re Bentley E.*, 703 S.W.3d 298, 303 (Tenn. 2024)). "When considering whether terminating a parent's rights is in the child's best interest, a trial court must consider the twenty factors enumerated in [the statute.]" *In re Bentley E.*, 703 S.W.3d at 303.

Our review of the determination as to Mercury's best interests is hampered by the trial court's failure to consider forty percent of the twenty statutorily specified factors based upon a failure of DCS to have pleaded them. DCS notes in its brief on appeal that "[t]he court found factors A, B, F, G, H, M, N, and O were neutral—weighing neither for nor against termination—because they were not pled by DCS." The parties on appeal, nevertheless, have proceeded to duel over factors that the trial court declined to consider based upon purported pleading failures. Because the trial court's order found these factors neutral based on DCS's failure to plead them rather than based upon the particular circumstances of the case or the evidence presented, "we are unable to discern whether the trial court considered each of the statutory factors and how the trial court considered the proof presented relative to the factors." *In re Michael S.*, No. E2025-01028-COA-R3-PT, 2026 WL 1494102, at *10 (Tenn. Ct. App. May 28, 2026). For example, on appeal DCS puts forward a developed argument that factors A and B actually support termination, and strongly so, while Mother insists that the factors support declining to terminate her parental rights. We have no findings, though, to review as to these factors because they were not considered as a result of DCS's purported pleading deficiencies.

In reviewing the record in this case, DCS filed a petition before the trial court that appears to have helped to generate confusion through how it addressed these factors. Nevertheless, Tennessee Code Annotated section 36-1-113(i) requires that "[i]n determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court." The statute then proceeds to set forth the twenty factors delineated above. Tenn. Code Ann. § 36-1-113(i). The trial court can certainly consider how evidentiary deficiencies impact certain factors in a particular case or conclude that a particular factor is not relevant given the circumstances of a particular case.[3] DCS is not free, however, to use its pleadings to amend the statutory requirements set forth by the General Assembly in Tennessee Code Annotated section 36-1-113(i) under which a trial court is required to consider all relevant and child-centered factors applicable to the case before the court in its best interest analysis. *In re Bentley E.*, 703 S.W.3d at 303. DCS may argue a factor or factors are not relevant in a particular case, but the trial court must make its own determination as to relevancy in the particular case – not decline to consider the factor because it was not pleaded.

Errors may occur in a trial court's reasoning as to a particular factor or factors without posing any significant challenge to the ultimate resolution as to the best interest of

---

[3] *See, e.g.*, *In re Ka'Myiah M.*, No. M2024-01421-COA-R3-PT, 2025 WL 3643403, at *16-20 (Tenn. Ct. App. Dec. 16, 2025), *no perm. app. filed*; *In re Silvia F.*, No. E2023-00704-COA-R3-PT, 2024 WL 3496302, at *15-17 (Tenn. Ct. App. July 22, 2024), *perm. app. denied* (Tenn. Nov. 11, 2024); *In re Temperance A.*, No. M2023-00641-COA-R3-PT, 2024 WL 2891918, at *19 (Tenn. Ct. App. June 10, 2024), *perm. app. denied* (Tenn. Aug. 9, 2024); *In re Glenn B.* No. M2023-00096-COA-R3-PT, 2023 WL 8369209, at *17 (Tenn. Ct. App. Dec. 4, 2023).

the child. However, given the sheer breadth of the number of factors not considered in determining whether to terminate parental rights and the improper basis for declining to consider these factors, we conclude that the more prudent course in the present case is to remand. This will allow the trial court to consider the twenty statutorily specified best interest factors in making a determination in accordance with Tennessee Code Annotated section 36-1-113(i). On remand both DCS and Mother should have an opportunity to present evidence addressing the factors A, B, F, G, H, M, N, and O as well as any other relevant child-centered factor applicable to the case before the court and not previously passed upon by the court. The trial court should then make appropriate findings as to these factors. Having done so, the trial court should proceed with considering its findings as to these factors in conjunction with its previous findings to determine Mercury's best interest.

V.

For the aforementioned reasons, we affirm the Juvenile Court for Greene County findings as to the grounds for termination but vacate and remand for consideration of Mercury's best interests in accordance with Tennessee Code Annotated section 36-1-113(i). Costs of this appeal are taxed to the appellee, the Tennessee Department of Children's Services, for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE